

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 31, 2022.**

_____
CRAIG A. GARGOTTA
CHIEF UNITED STATES BANKRUPTCY JUDGE
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-50477-CAG |
| | § | |
| MICHAEL CHRISTOPHER WIBRACHT, | § | |
| | § | CHAPTER 7 |
| Debtor. | § | |

### ORDER DENYING TRUSTEE'S OBJECTION TO CLAIM #20-1 OF LAURA WIBRACHT (ECF NO. 110)

This is the Court's Order on the Trustee's Objection to Claim #20-1 of Laura Wibracht (ECF No. 110)[1] ("Objection"). Laura Wibracht filed a Response of Laura Wibracht to the Chapter 7 Trustee's Objection to Claim #20-1 (ECF No. 136) ("Response"). The Court held a hearing on the matters on February 11, 2022 and took the matters under advisement.

For the forthcoming reasons, the Trustee's Objection is DENIED.

---
[1] "ECF" denotes electronic filing docket number.

1

## JURISDICTION

As a preliminary matter, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), and (I). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This case is referred to this Court by the Standing Order of Reference entered in this District.

## FINDINGS AND CONCLUSIONS

The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052(a), made applicable to this hearing by Fed. R. Bankr. P. 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

## FACTUAL AND PROCEDURAL BACKGROUND

Debtor Michael Wibracht filed his voluntary petition of Chapter 7 bankruptcy relief on April 22, 2021 (ECF No. 1). Laura Wibracht thereafter filed two timely claims: claims number 19 and 20. (*See* Claims Register). Claim Number 19 purports to be for child support (Claim No. 19-1) and Claim Number 20 purports to be for spousal support (Claim No. 20-1). Laura Wibracht, in other words, asserts that both her claims are priority claims because of their status as domestic support obligations. (*See* Claims Nos. 19–20).

Trustee moved for (ECF No. 70), and the Court approved (ECF No. 75), an interim distribution paying Laura Wibracht $10,840.15 on Claim 19-1 as a domestic support obligation.

Trustee filed his Objection to Claim 20-1. (ECF No. 110). Trustee's Objection advanced several arguments to object to allowance of the claim. First, Trustee objects that Claim 19-1, a

domestic support obligation also related to the divorce, was paid in full. (*Id.* at 2). Second, Trustee objects to the claim as a fraudulent transfer based on the state court judgment. (*Id.* at 3). According to the Trustee, the state court judgment constitutes an obligation, created within 2 years of the bankruptcy petition, to the benefit of an insider under an employment contract not in the ordinary course of business, and for less than reasonably equivalent value. (*Id.*). Trustee further argues that Michael Wibracht was not a party to the employment contract, so the obligation incurred by the judgment was involuntary. (*Id.*). Trustee argues this constitutes a constructively fraudulent transfer, which can be avoided through §§ 502(d) and 548.[2] (*Id.*). Third, Trustee objects to classifying a state court judgment based on an employment contract as a domestic support obligation. (*Id.*). Lastly, Trustee objects to the judgment granting Laura Wibracht an equitable lien on certain assets of the Debtor because Trustee is aware of no attempt to perfect those liens, so the unperfected lien can be avoided and disallowed through §§ 502(d) and 548. (*Id.* at 4).

Laura Wibracht then filed the Response. (ECF No. 136).[3] The Response denies the majority of allegations made in the Objection. (*Id.* at 1–2). The Response then lays out the factual and procedural history of the Wibracht divorce and related proceedings. (*Id.* at 2–4). The Response explains that Michael and Laura Wibracht reached a partial settlement of their divorce by executing an Employment Agreement between Laura Wibracht and 210 DG LLC, one of Michael's companies on June 23, 2016. (*Id.* at 2–3). The Employment Agreement provided Laura would be paid $7,000.00 monthly for an eight-year term and that Laura would additionally be entitled to bonuses paid to Michael. (*Id.* at 3). The Employment Agreement's effective date is July 1, 2016.

---

[2] Unless otherwise indicated, all section references are to Title 11 U.S.C. – et. seq.
[3] Laura Wibracht originally filed her Response at ECF No. 119. An exhibit attached to ECF No. 119 contained the names and dates of birth of minor children. Laura Wibracht filed a Motion to Restrict or Redact Document (ECF No. 132). The Court granted the motion (ECF No. 133) and restricted access to ECF No. 119. Laura Wibracht then again filed a Response with sensitive information redacted (ECF No. 136).

(*Id.* at 11). A day later, on June 24, 2016, the family court entered a Final Decree of Divorce approving the Amended Agreement Incident to Divorce which incorporated the Employment Agreement. (*Id.* at 2).

The Response further alleges that Michael Wibracht initially made payments to Laura under the Employment Agreement but ceased in October 2017. (*Id.* at 3). Laura brough her breach claim through arbitration. (*Id.*). The arbitrator awarded Laura $652,544.26 on January 29, 2019. (*Id.*). The family court then confirmed the arbitration and entered a final judgment in Laura's favor in the same amount on April 6, 2021. (*Id.*).

Citing both the Bankruptcy Code definition and Fifth Circuit precedent, the Response argues that, despite its label, the Employment Agreement constitutes a domestic support obligation between former spouses. (*Id.* at 4, 6–8). As a domestic support obligation, the Response argues that the claim is not subject to avoidance and must be given priority status, so the Objection should be overruled. (*Id.* at 8).

The Court held a hearing on the matter on February 11, 2022. The Court admitted Trustee's Exhibits 1–4 and Laura Wibracht's Exhibits 1–5. At the hearing, the Trustee and Laura Wibracht advanced substantially the same arguments as contained in the Objection and Response. Trustee argued that the Claim should be disallowed as a domestic support priority claim and instead allow it as a general unsecured claim. In the alternative, Trustee argued that the claim should be avoided and disallowed as a fraudulent transfer under §§ 502(d) and 548. Counsel for Laura Wibracht again argued that courts must look to the substance rather than labels of a disputed document to determine whether it is a domestic support obligation, so, within the context of the divorce, the Employment Agreement is a domestic support obligation and should be allowed with priority status.

4

The Court heard a proffer of testimony from the Trustee. Trustee proffered that he was appointed as Trustee in the case. During the administration of the estate, Trustee liquidated a townhome in Corpus Christi. Trustee proffered that he paid Laura Wibracht's Claim #19–1 in full. Trustee further proffered that he reviewed the records of the Corpus Christi property and found no indication of an obligation created by the divorce decree or granted incident to divorce. Trustee also testified that after reviewing financial records of the Debtor, Trustee found no evidence of receiving any value in exchange for the state court judgment. Laura Wibracht did not cross examine the Trustee.

The Trustee then called Laura Wibracht as a witness. Laura Wibracht testified that she owned and then sold a home at 3953 Fossil Rock in San Antonio, Texas in October of 2019. Upon Trustee's request, the Court took judicial notice of the Claims Register, noting the claims filed by creditor name, claim number, date, and amount.

Laura Wibracht then testified on her own behalf. In summary, Laura Wibracht is six credits shy of having obtained a bachelor's degree. She previously worked as an aesthetician before marrying Michael Wibracht. She and Michael met in January of 2007. They married in April of the same year. At the beginning of the marriage, Michael went to school full time pursuing a business degree from Texas A&M University and also worked for a company called MAPCO. Michael then worked full time. During the marriage, Laura did not work outside the home because she cared for the then-couple's four children.

Laura testified that Michael filed for divorce to be with a girlfriend, and Laura and Michael resolved the divorce by agreement in the summer of 2016. Laura testified that her Exhibit 1 is her "Employment Agreement with Michael." Laura and Michael entered into the agreement June 23, 2016. Laura testified the Employment Agreement was part of the settlement resolving the divorce.

5

Paragraph 4A provided "base compensation" for Laura. Laura testified that she and Michael intended the compensation to provide her support while she stayed home to care for the young children after the divorce. At the time of the divorce, the four Wibracht children were 3, 4, 5, and 6 years old. Laura testified that Paragraph 4B was intended to be her support as well. Laura further testified that no other agreement, beyond the contents of Paragraph 4, associated with the divorce provided support to her.

Laura testified that she understood her duties under the Employment Agreement to be staying home and caring for the children. Attachment A of the Employment Agreement confirm that Laura's duties were to "assist[] Company President with personal family matters as requested." Laura again testified that she agreed to stay home and care for the children and added that she was not allowed to go to the office. Laura reiterated that the purpose of the Employment Agreement was to let her be a stay-at-home mom while keeping her health insurance.

Laura testified that Michael terminated the agreement; she then sued Michael to recover the amount due under the Employment Agreement. Laura testified that she recovered a final judgment, which is contained in her Exhibit 5. Laura testified the amount contained in the judgment is still owed to her. Laura testified that the judgment is the basis of her Claim #20-1. She further testified she did not assign the rights to judgment to any other individual.

Laura testified she did whatever she could to provide for her children after Michael terminated the agreement, including cleaning houses, selling chicken eggs, and helping others organize their homes. Her income in 2019 was $32,000. Her income in 2020 was $33,000. Laura testified she cannot not seek other employment because she spent all her time caring for her four young children, including 3 hours driving her children to and from school across the city. She further testified that the onset of the COVID-19 pandemic required more of her time because her

children were forced to attend school remotely from home and needed increased supervision. Laura testified she stayed home every day "to try to make it as normal as possible" for her children. The children are currently ages 9, 11, 12, and 13. Laura testified childcare for all of four children would cost almost $4,000 per month. Laura testified she filed Claim #19-1 for back child support. She testified the claim as filed was paid.

On cross examination, the Trustee elicited testimony confirming that Michael Wibracht was to pay ad valorem property taxes and make mortgage payments on the house located at 3935 Fossil Rock in San Antonio, Texas. Trustee also confirmed that the Employment Agreement identifies the "employer" as 210 DG, LLC. Laura further stated that Michael owned the company. Trustee asked, but Laura denied, that Michael signed the agreement solely as a representative of 210 DG, LLC. Laura Wibracht waived her equitable lien on the debtor's property. That issue is no longer before the court.

### PARTIES' CONTENTIONS AND LEGAL ANALYSIS

Two issues remain before the Court. First, the Court must decide whether the judgment supporting Claim #20-1 is a domestic support obligation. Second, the Court must determine whether the Trustee can disallow the Claim #20-1 through avoiding it as a fraudulent obligation. the Court will address each issue in turn.

### I.     Claim #20-1 is a Domestic Support Obligation

Trustee objects to classifying a state court judgment based on an employment contract as a domestic support obligation. (ECF No. 110). For the following reasons, the Court overrules the Trustee's objection on domestic support grounds.

Debtors in bankruptcy cannot discharge domestic support obligations. 11 U.S.C. § 523(a)(5). A domestic support obligation is

> a debt that accrues before, on, or after the date of the order of relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is–
> (A) owed to or recoverable by–
>    (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>    (ii) a governmental unit;
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of–
>    (i) a separation agreement, divorce decree, or property settlement agreement;
>    (ii) an order of a court of record; or
>    (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A). In summary form, for the Employment Agreement to constitute a domestic support obligation, it must be (1) owed to or recoverable by a former spouse, (2) in the nature of alimony, maintenance, or support, (3) established by an order of a court of record, and (4) not assigned to a nongovernmental entity. *Id*.

### A. The Debt is Owed to Laura Wibracht as a Former Spouse

The parties do not dispute that the confirmed arbitration award enforcing the Employment Agreement creates a debt owed to Laura. The parties also do not dispute that Laura is Michael's former spouse. The evidence before the Court establishes these two points. Therefore, the Court

8

finds that the Employment Agreement enforced through the confirmed arbitration award is a debt owed to the debtor's former spouse.

### B. The Debt is in the Nature of Alimony, Maintenance, or Support

The Court will next consider whether the Employment Agreement is in the nature of alimony, maintenance, or support. The Fifth Circuit Court of Appeals and lower courts within the circuit read the plain language of the domestic support obligation definition expansively. ***Milligan v. Evert (In re Evert)***, 342 F.3d 358, 367 (5th Cir. 2003). A domestic support obligation is a debt that is "*in the nature* of alimony, maintenance, or support" of a spouse, former spouse, or child of the debtor. 11 U.S.C. 101(14A)(B) (emphasis added). "A liberal or broad interpretation of 'alimony' may be particularly appropriate under section 523(a)(5) because of the desire to avoid harming someone who is completely innocent and depends on their former spouse for their support (and often for their children's support as well) *because* of the bankruptcy of that former spouse." ***In re Evert***, 342 F.3d at 367 (emphasis in original). Courts also recognize debtors are incentivized "in the dischargeability context to try to characterize the obligation as something other than support so it can be discharged." ***Id.***

Because of the conflict between the policy need for broadly interpreting the definition of domestic support and "the obligated party['s] . . . incentive to craft the agreement to disguise support . . . so that it is dischargeable," courts in the Fifth Circuit look beyond the labels parties use. ***Id.*** Looking beyond the labels of an agreement to determine whether an agreement constitutes a domestic support obligation is longstanding practice within the Fifth Circuit. ***In re Nunnally***, 506 F.2d 1024, 1027 (5th Cir. 1975) ("[W]e should not be bound by the label which the state places on a decree; we must look to its substance."). *See also* ***Joseph v. O'Toole (In re Joseph)***, 16 F.3d

9

86, 87 (5th Cir. 1994) (similar); ***Dennis v. Dennis (In re Dennis)*,** 35 F.3d 274, 277–78 (5th Cir. 1994) (similar).

Rather than the labels, the intent of the parties at the time the agreement was executed determines whether payment pursuant to the agreement is a domestic support obligation. ***In re Evert*,** 342 F.3d at 368. "A written agreement between the parties is persuasive evidence of their intent." *Id.* (citations omitted). If the agreement clearly demonstrates intent for the debt to reflect a domestic obligation, then that characterization will normally control. *Id.* Conversely, if both the agreement plainly shows the parties' intent to constitute a property settlement or something other than domestic support, that characterization will also control. *See id.* If the agreement is ambiguous, then the court must determine the parties' intent by looking to extrinsic evidence. *Id.* In evaluating the parties' intent, courts look to the labels and form of the agreement as well as distinct provisions for nontrivial alimony and for property settlement in the divorce decree, if any. *Id.* at 370.

Here, the Court finds the written Employment Agreement ambiguous. On the one hand, the Employment Agreement sets out terms of employment between Laura Wibracht and the employer, 210 DG, LLC. (Wibracht Ex. 1, at 1). The Employment Agreement contains common employment provisions, such as compensation, benefits, termination of employment, and dispute resolution. (*Id*. at 1–8). The Court also observes, on the other hand, that other terms of the Employment Agreement are not typical of workplace contracts. For example, section 4C establishes that Michael, the President of 210 DG, LLC, will pay his bonuses to Laura's creditors in satisfaction of loans and a mortgage previously made on her behalf. (*Id*. at 2–3). The Employment Agreement "is binding on 210 DG, LLC and any Successor Entities, Affiliates and/or any development business entity that Michael Wibracht is a partner or principal in." (*Id*. at 7). The

ability of the agreement to follow Michael from business to business cuts against characterizing the Employment Agreement as a common workplace contract. Moreover, Laura's duties as Corporate Ambassador for Company "include assisting Company President with personal family matters." (*Id*. at Attach. A). The Divorce Decree contains no provision of alimony. (Wibracht Ex. 3). Because the Employment Agreement contains terms unusually found in a hiring agreement and the Divorce Decree does not provide for separate, nontrivial alimony, the Court concludes the Employment Agreement ambiguously reflects the parties' intent.

Once a court determines an agreement is ambiguous, the court must then determine the parties' intent through extrinsic evidence. ***In re Evert***, 342 F.3d at 368. Fifth Circuit courts previously employed the non-exclusive factors set out in ***Nunnally*** to interpret "just and right" divisions in Texas before the advent of alimony where, by necessity, all obligations were lumped together as property division. Courts still employ the ***Nunnally*** factors today to resolve ambiguity. *See* ***Hutton v. Ferguson (In re Hutton)***, 436 B.R. 819, 828 (Bankr. W.D. Tex. 2011) (citations omitted). The ***Nunnally*** factors are (1) the parties' disparity in earning capacity, (2) their relative business opportunities, (3) their physical condition, (4) their educational background, (5) their probable future financial needs, and (6) the benefits each would have received if the marriage continued. ***In re Dennis***, 25 F.3d at 279 (citations omitted).

Beyond the ***Nunnally*** factors, Courts also consider whether the agreement in question bears the "hallmark[s] of a support obligation," such as the duration of obligation[4], non-assignability and

---

[4] ***Evert*** suggests "[o]ne hallmark of a support obligation is that it terminates upon death." 342 F.3d at 369. ***Evert*** cites cases from bankruptcy courts in Georgia and Nevada from 1980 and 1981, respectively, to support this position. This Court observes, however, that Texas courts are prohibited from awarding permanent maintenance, terminating only upon death. Tex. Fam. Code Ann. § 8.054(a)(1) (West 2021) (effective Sept. 1, 2011). Duration of spousal maintenance in Texas, rather, is determined by the length of the marriage and the needs of the recipient spouse. *Id*. Moreover, Texas courts "shall limit the duration of the maintenance order to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs. . . ."

11

non-transferability of the obligation, and modification for changed circumstances. This Court will also include Laura's testimony regarding her and Michael's intent when evaluating the Employment Agreement.

Here, Laura never finished her bachelor's degree. Michael, on the other hand, holds a business degree from Texas A&M University. Laura previously worked as an aesthetician before marrying Michael but did not work outside the home during the marriage. By contrast, Michael worked full time and started multiple businesses during the marriage. The Court has no evidence about Laura and Michael's physical health at the time of the divorce. The Court can surmise as primary custodian of the four Wibracht children, Laura's financial needs to provide for the living expenses of five persons would be greater than Michael's financial needs to only support himself. (Wibracht Ex. 3, at 6). Some of the children's expenses, of course, would be covered by child support. If the marriage had continued, Laura would have likely continued to receive the benefits of Michael's salary. Michael's and Laura's division of labor, with Michael working outside the home and Laura raising the children, likely would have continued; in other words, Laura likely could have relied on Michael's income for her expenses. The Court therefore finds that the ***Nunnally*** factors militate towards finding the Employment Agreement is in the nature of domestic support.

Further, other extrinsic evidence supports finding the Employment Agreement creates a domestic support obligation. the "Term of Employment" established by the Employment Agreement automatically terminates after an 8-year term, unless extended my unanimous consent or earlier termination based on employee conduct. (Wibracht Ex. 1, at 1–2). The 8-year term,

---

Tex. Fam. Code Ann. § 8.054(a)(2). This Court, instead of termination upon death, will use Texas spousal maintenance law as a guidepost in determining whether the agreement bears hallmarks of a support obligation.

modifiable term is consistent with Texas law regarding duration of spousal maintenance. *See* Tex. Fam. Code Ann. § 8.054. Laura cannot assign her "rights, powers, duties or obligations" under the Employment Agreement, similar to how a spousal support obligation cannot be assigned. (*Id*. at 4–5). Importantly, the Employment Agreement "is binding on 210 DG, LLC and any Successor Entities, Affiliates and/or any development business entity that Michael Wibracht is a partner or principal in." (*Id*. at 7). The ability of the agreement to follow Michael from business to business mirrors how former spouses cannot shirk their support obligations. Michael's obligation to pay his bonuses in satisfaction of Laura's name, the mortgage on the Fossil Rock home, and after those debts are paid, half of his bonus to Laura, is comparable to common support obligations to pay mortgages and debts of former spouses as support. (*Id*. at 3). The Final Decree of Divorce explicitly references and merges "an informal settlement agreement between the parties." (Wibracht Ex. 3, at 2). Merging the Employment Agreement into the Final Decree of Divorce provides strong evidence that the Employment Agreement is in the nature of domestic support.

Lastly, Laura repeatedly testified that she and Michael intended the Employment Agreement to provide her with support and health insurance so she could continue to raise the children at home full time. Laura also testified Michael paid her under the agreement while she was a stay at home mom until Michael decided to terminate the agreement. The compelling documentary and testimonial evidence persuade this Court that the Employment Agreement is in the nature of domestic support.

### C. The Debt was Established by the District Court for the 73rd Judicial District in Bexar County, Texas

To be a domestic support obligation, the debt must have been entered by a court of record. Here, the 73rd Judicial District in Bexar County, Texas entered the Final Decree of Divorce, which approved and incorporated the Employment Agreement as an Agreement Incident to Divorce.

13

(Wibracht Ex. 3). The same court also ordered arbitration and entered final judgment enforcing the arbitrator's findings. (Wibracht Exs. 4, 5). Therefore, the Court finds the debt was established by a court of record.

### D. The Debt has not been Assigned to a Nongovernmental Entity

Lastly, to be a domestic support obligation, Laura must not have assigned the debt to a nongovernmental entity. Neither party argues Laura did so. In fact, Laura moved to enforce the debt and obtained a judgment in her favor. (Wibracht Exs. 4, 5).

In conclusion, the Court finds the Employment Agreement, enforced through the final judgment, is a domestic support obligation. This debt is a domestic support obligation under § 101(14A) and entitled to priority status under § 726(a)(1).

### II. The Judgment Underlying Claim #20-1 is Not a Fraudulent Obligation

The Court will not address Trustee's argument that Claim #20-1 is avoidable as a fraudulent obligation. Trustee seeks to use his powers under Section 502(d) to avoid the state court judgment as a fraudulent obligation. Section 502(d) requires Court to "disallow any claim of an entity . . . that is a transferee of a transfer avoidable under section . . . 548 . . . of this title."

Trustees may avoid constructive fraudulent obligations under § 548. 11 U.S.C. § 548(a)(1). The elements of a constructive fraudulent obligation are that (1) the debtor incurred an obligation, (2) within two years of the petition date, and (3) the debtor received less than reasonably equivalent value in exchange for the obligation. 11 U.S.C. § 548(a)(1)(B)(i). The Trustee must further establish a fourth element, but may do so by proving one of four things: that the Debtor (I) was insolvent at the time the was obligation incurred; (II) was engaged in business or a transaction for which any property remaining with the Debtor was an unreasonably small capital; (III) intended

14

to incur, or believed that it would incur, debts beyond the debtor's ability to pay; or (IV) made such transfer or incurred such obligation to benefit an insider under an employment contract and not in the ordinary course of business. *See* 11 U.S.C. §§ 548(a)(1)(B)(I)–(IV).

Trustee argues that the state court judgment constitutes an obligation, created within 2 years of the bankruptcy petition, and for less than reasonably equivalent value. (ECF No. 110, at 3). Trustee argues both that Michael was insolvent at the time the obligation was incurred and that the obligation is to the benefit of an insider under an employment contract not the in the ordinary course of business. (*Id.*). Trustee further argues that Michael was not a party to the employment contract, so the obligation incurred by the judgment was involuntary. (*Id.*). Laura's Response does not address the Trustee's fraudulent transfer argument.

The Court will address each of the elements of a fraudulent obligation in turn.

### A. Michael Wibracht Incurred an Obligation

Trustee argues that Michael was not a party to the Employment Agreement, so the Debtor did not incur an obligation. (ECF No. 110 at 3). Rather, Trustee insists that the Employment Agreement is between Laura and 210 DG, LLC. At the hearing, Laura Wibracht testified that Michael signed the agreement in his personal capacity.

Laura Wibracht and 210 DG, LLC are clearly the parties to the Employment Agreement. (Wibracht Ex. 1, at 1). The terms of the Employment Agreement, however, do not only create obligations for Laura and 210 DG, LLC. Paragraph 4C imposes an obligation on Michael—individually—to pay his bonuses in satisfaction of Laura's debts and the mortgage. (*Id.* at 2–3). Once those debts are satisfied, the terms of the Employment Agreement still obligate Michael to pay 50% of his bonuses to Laura. (*Id.* at 3). Moreover, the state court ordered that Michael, another

15

principal of 210 DC, LLC, and 210 DG, LLC are "jointly and/or severally" liable to Laura for breach of the Employment Agreement. (Wibracht Ex. 5, at 2). The Court therefore finds that Michael incurred an obligation under the Employment Agreement.

### B. The Obligation was Not Incurred within Two Years of the Petition Date

Whether the obligation as incurred within two years of the petition date is the determinative issue. Trustee argues that the state court judgment incurred the obligation, and because the state court judgment was entered just days before Michael filed for bankruptcy, the obligation was incurred within two years of the petition date. (ECF No. 110 at 3).

Trustee confuses the date the obligation was enforced with the date it was incurred. Agreements incident to divorce in Texas are governed by the law of contracts. ***McCray v. McCray***, 584 S.W.2d 279, 280 (Tex. 1979) (citations omitted). Agreements incident to divorce commonly have one of three effective dates. Kendrick & Kendrick, 23 Texas Transaction Guide—Legal Forms § 100.210 (Lexis 2022) (Provisions Regarding Effective Date of Agreement). Some are effective immediately upon formation of a valid contract. *Id*. at (b). Others are effective on a date specified in the agreement. *Id*. at (c). Some agreements incident to divorce only becoming binding if approved by the court. *See, e.g.*, ***Myers v. Myers***, 503 S.W.2d 404, 405 (Tex. Ct. App.—Houston [14th Dist.] 1973) (no writ) ("This agreement shall be binding and of legal effect when it is approved by the Court and the divorce is granted.").

Here, Michael and Laura executed the Employment Agreement on June 23, 2016. (Wibracht Ex. 1, at 1). The state court entered the Final Decree of Divorce, which incorporates the Employment Agreement, on June 24, 2016. The Employment Agreement states that the term of 'employment' will begin on July 1, 2016. The Court finds, therefore, that Michael incurred the

obligation to pay Laura on July 1, 2016—the effective date of the contract. July 1, 2016 is notably the latest of the three dates related to the divorce and Employment Agreement. Michael did not file for bankruptcy until April 22, 2021. (ECF No. 1). July 1, 2016 is more than two years before April 22, 2021. Therefore, the Court finds that Michael's obligation to pay Laura domestic support was not incurred within two years of the petition date.

### C. Michael Wibracht Received a Reasonably Equivalent Value for the Obligation

Trustee argues Michael received nothing in return for the judgment obliging him. (ECF No. 100, at 3). The Court disagrees for two reasons.

First, Michael incurred an obligation to pay Laura on July 1, 2016, not the date the state court entered judgment.

Second, whether Michael received reasonably equivalent value in exchange for his obligation must be considered in the context of the divorce. If a divorce was fully litigated, without any suggestion of collusion, sandbagging, or any irregularity, the divorce "should not be unwound by the federal courts merely because of its unequal division of marital property" as a fraudulent transfer or obligation. ***Ingalls v. Erlewine (In re Erlewine)***, 349 F.3d 205, 212–13 (5th Cir. 2003). Reasonable equivalence is not a purely economic test and its analysis must consider the "context of a judicial transfer." ***Id.*** at 212.

Trustee makes no argument about whether the terms of divorce were a product of collusion, sandbagging, or any other irregularity. In fact, Trustee makes no argument about the terms of divorce.

Here, the Court finds that Michael likely did receive reasonably equivalent value for his obligation. Laura testified extensively that she stayed at home raising the Wibracht children until

17

and after Michael ceased making payments under the Employment Agreement. Because Laura's work duties were to care of the children, the fact that she did and continues to do so gives Michael reasonably equivalent value. Moreover, this Court will not ignore the comity owed to state courts in a federalist system. Therefore, the Court finds Michael received the reasonably equivalent value of his obligation.

### D. Trustee has Not Met his Burden to show Insolvency

The final element of a fraudulent transfer may be proven by showing that the debtor "was insolvent on the date . . . such obligation was incurred, or became insolvent as a result of such . . . obligation." 11 U.S.C. § 548(a)(1)(B)(i)(I). Insolvency is a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation." 11 U.S.C. § 101(32)(A).

Trustee filed an Insolvency Analysis Regarding Trustee's Objection to Claim of Laura Wibracht (ECF No. 130) ("Insolvency Analysis"). Trustee references Michael's bankruptcy Schedules. (ECF No. 130, at 1 (citing ECF Nos. 1, 26, and 87)). Michael's Amended Schedules disclose assets valued at $570,305, some of which are claimed as exempt. (ECF No. 87, at 8–9). His Amended Schedules also disclose more than $17 million in debt. (*Id.*).

The Trustee has established that Michael is currently insolvent. The Debtor's current insolvency, however, is not the issue. The Trustee must prove that Michael was insolvent at the time the obligation was incurred—on July 1, 2016—or shortly thereafter as a result. The Trustee has not met his burden on this element.

### E. Michael Wibracht did not Incur the Obligation to the Benefit of an Insider under an Employment Contract not in the Ordinary Course of Business

Another way the Trustee can establish the fourth element of a fraudulent transfer is by proving the debtor "incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." 11 U.S.C. § 548(a)(1)(B)(ii)(IV). Trustee argues that, if the Employment Agreement created the obligation, then it was to the benefit of an insider and not in the ordinary course of business. (ECF No. 110, at 3). The Trustee's argument fails for two reasons.

First, as explained in Part I of this Order, the Court finds that the Employment Agreement is substantively a domestic support obligation, not an employment contract. Second, Laura Wibracht was no longer an insider of the debtor when the obligation was incurred.

If the debtor is an individual, an "insider" includes, "a relative of the debtor or of a general partner of the debtor." 11 U.S.C. § 31(A)(i). The Code defines a relative as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such degree." 11 U.S.C. § 101(45). The Code defines neither affinity nor consanguinity. Black's Law Dictionary defines "affinity" as a "relationship by marriage." Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary conversely defines "consanguinity" as the "relationship of persons of the same blood or origin." *Id*. "It is cardinal law in Texas that a court construes a statute, 'first, by looking to the plain and common meaning of the statute's words.'" **Fitzgerald v. Adv. Spine Fixation Sys., Inc.**, 996 S.W.2d 864, 865 (Tex. 1999) (citation omitted). The Court will therefore conclude that a relative is a person connected to another by blood or marriage.

19

Neither party argues that Laura and Michael are related by blood, a step-relationship, or adoption. The issue is whether she is an insider as Michael's relative by affinity. As the Court explained in Part II.B, Michael's obligation under the Employment Agreement was incurred on July 1, 2016. The Wibracht divorce was final on June 24, 2016. As of June 24, 2016, Michael and Laura were no longer married, so they were no longer relatives. No longer related to Michael because of the divorce, Laura was not an insider at the time the obligation was incurred. For these reasons, the Trustee cannot prove the obligation was incurred to the benefit of an insider under an employment contract outside the ordinary course of business.

The Court, therefore, finds that no fraudulent obligation was incurred. The Trustee cannot avoid the debt under §§ 502(d) and 548.

## CONCLUSION

For the foregoing reasons, IT IS THEREFORE ORDERED that the Objection to Claim #20-1 of Laura Wibracht (ECF No. 110) is DENIED;

IT IS FURTHER ORDERED that Claim #20-1 of Laura Wibracht is ALLOWED in the full amount of $652,544.26; and

IT IS FURTHER ORDERED that Claim #20-1 of Laura Wibracht is GRANTED priority status as a domestic support obligation under 11 U.S.C. §§ 101(14A) and 726(a)(1).

# # #